**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert J Wilson, | No. CV-19-00068-TUC-SHR |
| Plaintiff, | **Order Re: Motions for Summary Judgment** |
| v. | |
| Maricopa County Community College District Governing Board, et al., | |
| Defendants. | |

Pending before the Court are Plaintiff Robert Wilson's Motion for Partial Summary Judgment (Doc. 65) and Defendants: Governing Board of Maricopa County Community College District, Maricopa County Community College District, Maria Harper-Marinick, Kate Smith, and Deric Hall's Motion for Summary Judgment (Doc. 66). For the following reasons, the Court grants Defendants' Motion and denies Plaintiff's Motion.

## I.    Procedural Background

In December 2019, Wilson filed his Second Amended Complaint (Doc. 21), in which he alleged eleven counts[1]:

- Count One: "Violations of Procedural Due Process of Law";
- Count Two: "Violations of Substantive Due Process of Law";
- Count Three: "Violations of Equal Protection of the Law";

---

[1] Although Wilson labels his counts as "causes of actions," for simplicity, the Court will refer to them as counts. Moreover, the Court notes the numerical labels used here are reflective of Wilson's labeling and no Count Seven or "Seventh Cause of Action" exists in his Complaint.

- Count Four:  "Violations of Plaintiff's Freedom of Speech Rights";
- Count Five:  "Age and Gender Discrimination in the Workplace and Resultant Retaliation by Libel and Defamation of Character";
- Count Six:  "gender and age discrimination" in "violation of 29 U.S.C. § 621";
- Count Eight:  retaliation under Title VII of the Civil Rights Act and the Age Discrimination in Employment Act ("ADEA");
- Count Nine:  hostile and abusive work environment in violation of Title VII and the ADEA;
- Count Ten: Libel;
- Count Eleven:  "Intentional Infliction of Emotional Distress by Defendants' Civil Conspiracy"; and
- Count Twelve: "Defendant Violated Their Duty of Transactional Fairness Owed Plaintiff and Committed Common-Law Fraud [sic]."

In an August 24, 2020 Order,[2] the Court dismissed eight of the eleven counts for failure to state a claim upon which relief may be granted, dismissed the sex discrimination claims in Counts 5 and 6, and dismissed Maria Harper-Marinick (District Chancellor), Kate Smith (Rio Salado President), Angela Kwan (Faculty Chair of the District's Paralegal Program), and Deric Hall (District Director of Equal Employment Opportunity) from Counts 5 and 6. (Doc. 29.)  Therefore, the only remaining claims are Counts 4 (Freedom of Speech), 5 (Age Discrimination under Title VII), and 6 (Age Discrimination under the ADEA).  The Court denied Wilson's request to file a third amended complaint, but granted Wilson leave to file a stipulated amended complaint "that conforms with the Court's August 24, 2020 [O]rder and clarifies the remaining counts."  (Doc. 48.)  No such stipulated amended complaint was filed.  Wilson and Defendants have since filed motions for summary judgment, which are pending before the Court.

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine

_____

[2]The Order was signed August 21, but was not docketed until August 24, 2020. (Doc. 29.)

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and the fact in contention is material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

Under the Local Rules of Civil Procedure:

(a) Separate Statement of Facts. Any party filing a motion for summary judgment must file a statement, separate from the motion and memorandum of law, setting forth each material fact on which the party relies in support of the motion. The separate statement should include only those facts that the Court needs to decide the motion. Other undisputed facts (such as those providing background about

the action or the parties) may be included in the memorandum of law, but should not be included in the separate statement of facts. Each material fact in the separate statement must be set forth in a separately numbered paragraph and must refer to a specific admissible portion of the record where the fact finds support (for example, affidavit, deposition, discovery response, etc.). A failure to submit a separate statement of facts in this form may constitute grounds for the denial of the motion.

(b) Any party opposing a motion for summary judgment must file a statement, separate from that party's memorandum of law, setting forth:  (1) for each paragraph of the moving party's separate statement of facts, a correspondingly numbered paragraph indicating whether the party disputes the statement of fact set forth in that paragraph and a reference to the specific admissible portion of the record supporting the party's position if the fact is disputed; and (2) any additional facts that establish a genuine issue of material fact or otherwise preclude judgment in favor of the moving party.  Each additional fact must be set forth in a separately numbered paragraph and must refer to a specific admissible portion of the record where the fact finds support.

LRCiv 56.1.  Neither Wilsons' statement of fact in support of his Motion, nor his controverting statement of fact in opposition to Defendants' Motion complies with the Local Rules.  Wilson's  statements of fact assert immaterial, irrelevant facts, and he does not set forth each material fact in a separately numbered paragraph or set forth correspondingly numbered paragraphs clearly indicating whether he disputes Defendants' statements of fact, and he does not consistently refer to the specific admissible portion of the record supporting his facts or position in opposing Defendants' statements of fact. (Doc. 65-1.)  Defendants argue Wilson's failure to comply with the Local Rules is grounds for denying his Motion because under LRCiv 56.1(a),"failure to submit a separate statement of fact in this form may constitute grounds for the denial of the motion."

Although Wilson is representing himself, pro se litigants must become familiar, and comply, with the Federal Rules of Civil Procedure and the Local Rules.  *See Warmack v.*

*Riveria*, CV-20-02298-PHX-SPL, 2021 WL 5040329, at *3 (D. Ariz. Oct. 29, 2021); *see also King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987) (overruled on other grounds by *Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012)) ("Pro se litigants must follow the same rules of procedure that govern other litigants."). The Court could deny his Motion for this reason. Nonetheless, the Court will consider the merits of Wilson's Motion. However, where Wilson has failed to cite to the portions of the record supporting his facts or has failed to address Defendants' facts in accordance with LRCiv 56.1, the Court disregards Wilson's facts and accepts Defendants' facts as undisputed for the purpose of summary judgment. *See* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . [or] grant summary judgment if the motion and supporting materials— including the facts considered undisputed—show that the movant is entitled to it.").

### III. Undisputed Facts

The following facts are derived from the parties' statements of facts and are undisputed for the purpose of summary judgment.

In 1995, Wilson was hired by the Maricopa County Community College District ("MCCCD" or "District") as an adjunct professor for the Rio Salado paralegal program. (DSOF ¶ 8; PCSOF ¶ 8.)[3] Before being hired, Wilson was a practicing attorney in Texas until his license was suspended following a felony conviction for forgery.[4] (DSOF ¶ 52, Exh. 1; PCSOF ¶¶ 14–16.)

In March 2014, Emily Klein Alice, a licensed attorney with experience practicing in Arizona and teaching at another community college in the District, began working for the District as an adjunct professor in Rio Salado's paralegal program. (DSOF ¶¶ 17–18, Exh. 3 ¶ 11; PCSOF ¶¶ 7, 11.) About four months later, Kwan assigned Alice the role of

---

[3]DSOF is Defendants' statement of fact filed in support of their Motion and PCSOF is Plaintiff's controverting statement of fact filed in opposition to Defendants' Motion. DSOF is docketed at item 67 in the electronic record, and PCSOF is docketed at item 80-1.

[4]Although Wilson contends this is not true, for the reasons explained below, the Court treats this as undisputed.

Lead Instructor for the paralegal program to implement new ideas to improve the program and facilitate curriculum development.  (DSOF ¶¶ 19–22, Exh. 3 ¶¶ 12–14; PCSOF ¶¶ 11–12.)  Shortly after Alice became Lead Instructor, she began make curriculum changes with which Wilson disagreed.  (DSOF ¶¶ 14–19, Exh. 3A; PCSOF ¶ 12.)  Because of Wilson's opposition to the curriculum changes, Kwan began assigning Wilson fewer course development roles and, according to Kwan, she began questioning whether she should continue assigning Wilson coursework because of his "inability to work well with [Alice]" and because his "apparent opposition" to the changes "caused friction within the department."  (DSOF ¶¶ 23–29, Exh. 3 ¶¶ 18–19; PCSOF ¶ 12.)

On July 18, 2018, Rio Salado's Vice President of Academic Affairs at the time, Kate Smith, requested information from Kwan regarding Wilson and forwarded an email from a District Governing Board Member who had received media inquiries about Wilson.  (DSOF ¶ 32–35, Exhs. 2, 2B, 3; PSOF ¶ 9, Exh. A-3.)[5]  The email forwarded from the Board Member contained a link to an online article from the Arizona Republic which was published on July 16, 2018, and is titled:  "Arizona Senate candidate who killed his mother supports 'good guys' with guns."  (DSOF ¶ 33, Exh. 3B.)  The article was written after Wilson, while attending a gun control forum as a Republican candidate for Arizona State Senate, told the crowd at the forum about how he shot and killed his mother in self-defense when he was a teenager in Oklahoma.  (DSOF Exh. 3B.)  The article went on to report Wilson had been charged with murdering his mother and sister, confessed to the murders after being arrested, then recanted and claimed he had amnesia about the events of the night in question.  (*Id.*)  After a jury found Wilson suffered from amnesia, the judge ruled Wilson was "not capable of proceeding to trial and making a rational defense" and suspended the case until Wilson could regain enough memory to defend himself against the charges.  (*Id.*)  Seven years later, the court dismissed the charges when Wilson's attorney argued Wilson had been deprived of his right to a speedy trial.  (*Id.*)  The Arizona Republic article cites a 2017 Green Valley News article that reported Wilson eventually came to remember the

[5]PSOF is Plaintiff's statement of fact in support of his Motion for Partial Summary Judgment and is docketed at item 65 in the electronic record.

events and remembered shooting his mother in self-defense, though the Arizona Republic article cites court records and newspaper articles from the time that suggest a very different version events.  (*Id.*)  The Arizona Republic article goes on to note Wilson had moved to Texas for college and law school, where he practiced law for twenty years.  (*Id.*)

After receiving Smith's email inquiring about whether the Robert Wilson in the Arizona Republic article was employed at Rio Salado, Kwan replied he was and that she had "no idea of his background," as he had been hired in the paralegal department before Kwan became Faculty Chair.  (DSOF ¶ 21, Exh. 2B.)  The District continued to monitor news publications for additional reporting about Wilson and about a month after the first article, on August 13, the Arizona Republic published an article reporting Wilson had broken down a door and threatened the president of his homeowners association in 2016.  (DSOF ¶¶ 40–41, Exh. 3C.)  That article went on to cite to court records indicating Wilson's Bar license in Texas had been suspended in 1990 following a felony forgery, and he had resigned his Bar license in Texas "in lieu of disciplinary action" in 1994.  (DSOF ¶¶ 42–54, Exhs. 3C, 3E.)

Wilson disputes whether he was disbarred and convicted of forgery.  (PCSOF ¶¶ 14–16.)  Wilson concedes his license had automatically been suspended when he left Texas, but asserts it was "due to a non-criminal case that had been dismissed in 1993" and he argues he never resigned his license, but rather "[s]ome unknown person" "wrote an unsworn forged letter to the State Bar of Texas stating [he] wished to resign."  (*Id.* ¶ 14.)  Wilson, however, provides no evidence supporting his contention other than his own affidavit. In contrast, Defendants provided Wilson's resignation letter, the State Bar of Texas Chief Disciplinary Counsel's response to the resignation letter, and the Supreme Court of Texas order revoking Wilson's license.  (*Id.* Exh. 3E.)  These records establish that in July 1994, the State Bar of Texas received a letter, purportedly from Wilson, resigning his license and accusing the State Bar of mishandling his case, and the Supreme Court of Texas revoked Wilson's license the following month.  (DSOF Exh. 3E, *In Re Wilson*, Misc. No. 34-9125 (Tex. Aug. 18, 1994).)

As to his conviction, Wilson asserts the "so-called forgery case" against him in

Texas arose from a personal dispute between him and the president of a bank, related to Wilson filing "a fictitious release of the bank's lien at the recorder's office in order to buy time" in relation to a friend's bankruptcy case. (*Id.* ¶ 16.) According to Wilson, "a district judge ordered [him] to do two hundred hours of community service and then granted him early dismissal on the forgery case. Under Texas statutory law (Texas Penal Code: 46.04a), that dismissal kept the matter from being a final conviction and **no criminal felony conviction occurred**." (*Id.* (emphasis in original).) Wilson provides no court records supporting his contentions and merely offers his own affidavit.[6] (*Id.* Exh. A-7.) Defendants provided the Texas Court of Appeals opinion affirming Wilson's conviction for forgery, which explains Wilson was "indicted for forgery, convicted by a jury and sentenced by the judge to 3 years in [the Texas Department of Corrections], probated."[7] (DSOF Exh. 3D (*Wilson v. State*, No. 10-90-021-CR (Tex. Crim. App. Feb. 14, 1991)).)

Kwan considered the reports of Wilson's disbarment and conviction to be credible because they were supported by the publicly available court opinions and documents described above. (DSOF ¶ 55.) After considering those documents, Kwan decided not to allow Wilson to continue teaching at Rio Salado because she was concerned "allowing a disbarred attorney and convicted felon to teach paralegal classes could adversely impact the credibility and reputation of Rio Salado and the District" and she was concerned his disbarment and conviction would undermine his credibility in front of his students. (*Id.* ¶¶ 56–57, Exh. 3 ¶¶ 29–30.)

[6]In Wilson's Preliminary Statement in his Response to Defendants' Motion, he asserts he "stated under oath that he is not a convicted felon, he never resigned from the Texas Bar Association," and cites to his "official FBI criminal records file as conclusive proof of no felony convictions." (Doc. 80 ¶ 3.) First, the purported records Wilson has provided are not verified. Second, as Defendants note, the FBI record provided by Wilson specifically states: "This does not preclude further criminal history at the state or local level." (PCSOF Exh. A-2.) Thus, the records are not conclusive, as the Court of Appeals decision shows he was convicted at the state level. Finally, whether Wilson is in fact a convicted felon is immaterial to the issue whether the records of his conviction (*e.g.*, the Texas Court of Appeals opinion) exist, were referenced in the news articles, and were considered by Kwan when she decided to terminate Wilson.

[7]"Probated" refers to a suspended sentence, in which a court suspends the imposition of the sentence and places the defendant on probation. *See Ex parte Langley*, 833 S.W.2d 141, 143 (Tex. Crim. App. 1992) (probated sentence means defendant is convicted and a punishment is assessed, but imposition of sentence is suspended); *see also Davis v. Estelle*, 529 F.2d 437, 440 (5th Cir. 1976).

On August 16, 2018, Kwan notified Wilson he would not be teaching at Rio Salado in the fall semester because of the concerns raised in the articles and negative impact it would have on the program.  (DSOF ¶ 61, Exh. 3 ¶ 33.)  After that conversation, Wilson communicated with a student, commenting on his termination and claiming he was terminated because of "bad press."  (*Id.* ¶ 62, Exh. 3 ¶ 34.)  On August 18, Kwan emailed Wilson to confirm his termination and began removing his access to Rio Salado's email accounts and other online resources.  (*Id.*)

On September 5, 2018, the District receive a notice of claim from Wilson, alleging age and sex discrimination and wrongful termination.  (DSOF ¶ 66, Exh. 4.)  Subsequently, the District's Director of Equal Employment Opportunity, Deric Hall, initiated an internal investigation into Wilson's allegations.  (*Id.* ¶ 67, Exh. 4.)

In April 2019, Hall issued his Report of Findings ("EEO Report"), which considered and summarized the newspaper articles, the Texas Court of Appeals opinion, and Texas Supreme Court order described above.  (*Id.* Exh. 4.)

On May 21, 2019, Wilson filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), alleging the most recent discriminatory job action occurred on August 22, 2018.  (DSOF ¶ 73, Exh. 5.)  Wilson explained in the Charge:  "I have been an instructor with MCCCD since 1995.  Terminated on 8-22-2018.  I have more experience, training, education and knowledge than a much younger (in her twenties) female [who] was awarded a position of 'Lead Paralegal Instructor' over me in 2017–2018.  I am in my seventies."  (*Id.*)  The EEOC declined to file a suit and notified Wilson of his right to sue.  (Doc. 19.)

**IV.   Discussion**

Defendants move for summary judgment on Wilson's First Amendment and age discrimination claims.  (Doc. 66 at 1.)  Wilson moves for partial summary judgment on his First Amendment claim. (Doc. 65 at 1.)

A.   First Amendment Claim

Wilson moves for partial summary judgment "on one of [his] First Amendment, Section 1983 (Freedom of Speech) claims pending against these Defendants in this action."

(Doc. 65 at 1.)  Although Wilson does not identify which count pertains to this claim, he appears to be referring to Count Four, which is titled, "Violation of Plaintiff's Freedom of Speech Rights," and refers to 42 U.S.C. § 1983.[8]  (Doc. 21 at 14–15.)  Defendants also move for summary judgment on Wilson's First Amendment claim.  (Doc. 66 at 5–8.)

In Count Four, Wilson alleges he was terminated soon after "local area Democrat controlled newspapers . . . published false statements and hateful gossip concerning Wilson and his candidacy" and alleges Kwan told him "she had received orders . . . from above to fire [him] because of" those newspaper articles.  (Doc. 21 at 15.)  He asserts he "was thereby denied his right of freedom of speech . . . because he was fired for some unknown reason based upon some unknown article." (*Id.*)  Wilson further alleges he had seen and heard anti-Republican and anti-Trump sentiments expressed by District employees, which created "an obvious anti-Republican atmosphere" on campus, and he contends he "was quite possibl[y] fired because of his Republican Party affiliation and his candidacy for state office on the Republican ticket." (*Id.* at 16.)  According to Wilson, his termination following the articles, combined with the alleged anti-Republican atmosphere constitute a "clear[] . . . violation of his right to free speech as a political candidate." (*Id.*)  Although Wilson does not use the word "retaliate" in Count Four, the Court understands his claim to be for First Amendment retaliation in violation of § 1983.  The Court will first consider Defendants' Motion on this count.

Section 1983 provides a tort remedy against "[e]very person who, under color of [state law] subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.  "Culpability, however, is limited not only by the causal connection of the official to the complained-of violation, but also by his intent (depending on the underlying constitutional violation at issue) to deprive another of that person's rights; both

---

[8]Although Wilson does not expressly argue retaliation under the ADEA, he mentions retaliation in Count Five in reference to the events underlying his retaliation claim in Count Eight, which was dismissed for failure to state a claim.  (Doc. 21; Doc. 29.) Therefore, to the extent Wilson appears to allege a retaliation claim in Count Five, the Court's reasoning in the August 24, 2020 Order applies and Defendants would be entitled to judgment on that claim.

1
2
3

limitations on the nature of culpable conduct are critical, for 'each Government official . . . is only liable for his or her own misconduct.'"  *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 916 (9th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)).

4
5
6
7
8
9
10

"To state a First Amendment retaliation claim, a plaintiff must plausibly allege 'that (1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct.'"  *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019) (quoting *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016)).  The United States Supreme Court has explained:

11
12
13
14
15
16

> To prevail on such a claim, a plaintiff must establish a "causal connection" between the government defendant's "retaliatory animus" and the plaintiff's "subsequent injury."  It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury.  Specifically, it must be a "but-for" cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.

*Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (internal citations omitted).

17
18
19
20
21
22
23
24
25
26
27
28

The parties do not dispute Wilson's political speech was protected by the First Amendment, but sharply dispute the second and third elements.  In their Motion, Defendants focus primarily on the lack of a causal connection between Defendants' actions and Wilson's termination, as they argue Wilson "cannot show that his political speech was the 'but-for' cause of his termination," as his political speech was not a cause of his termination—rather, "[i]t is only after the District learned of the [Wilson]'s felony conviction and disbarment that action was taken to terminate the Plaintiff's employment." (Doc. 66 at 5.)  Defendants further assert there is no evidence Kwan had any animus against Wilson arising from his political speech or any defendant considered Wilson's political speech or activity as a basis for taking action against him.  (*Id.* at 5–6.)  Defendants reiterate Kwan terminated Wilson because of his disbarment and felony conviction, and would have terminated him absent his political speech, to protect the credibility of the Rio Salado

paralegal program, as allowing a disbarred attorney and convicted felon to teach could "adversely impact the credibility and reputation of Rio Salado and the District." (*Id.* at 6–7.) With respect to the second element, Defendants merely assert their investigation into Wilson's discrimination complaint and subsequent EEO Report "is not the sort of conduct which would chill the speech or dissuade a person of ordinary firmness from engaging in protected activity." (*Id.* at 6.) Finally, Defendants assert that even if Wilson could show a constitutional violation, Defendants would be immune from liability and, even if Wilson had brought a § 1983 claim against the District or its Governing Board, such a claim would fail because he would not be able to establish liability pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). (*Id.* at 7–8.)

In his Response, Wilson argues Defendants "located and distributed clearly false and vicious newspaper articles and tabloid accounts of the tragic event to the public and to the employees of MCCCD for the very purpose of damaging [him]," and, therefore, there was "a clear causal connection showing retaliatory animus." (Doc. 80 at 5.) Wilson contends the newspaper articles are false—he asserts he never threatened anyone and maintains he was never convicted of a felony offense and never resigned his law license[9]— but he does not dispute the content of the articles that motivated Kwan to terminate him and, as explained above, he provides no admissible evidence to refute the articles' claims, so these facts are deemed undisputed for the purpose of summary judgment. *See* Fed. R. Civ. P. 56(e). (Doc. 80 at 4, 7.) Further, Wilson provides no evidence whatsoever of Kwan acting with any retaliatory animus. He merely asserts his political statements were "the substantial or motivating factor in the creation of the follow-up article(s) about him." (*Id.* at 6.) Therefore, Wilson has failed to meet his burden of showing a genuine dispute of fact exists as to whether Kwan had a retaliatory motive when she terminated him. *See Anderson*, 477 U.S. at 248, 250.

Wilson further argues, "***but for*** [him] making his public speech on matters of public concern in July 2018, no articles about his history would have appeared and he would not

---

[9]As explained above, Wilson cites no admissible portion of the record supporting his position. *See* LRCiv 56.1(b).

have been terminated by Defendants." (Doc. 80 at 6 (emphasis in original).) That is, Wilson appears to acknowledge the sequence of events is this: Wilson made political statements at a forum on July 9, 2018; after hearing his statements, newspaper reporters investigated his story and published an article about him on July 16; the District learned of the first article on July 17; on August 13, the Arizona Republic published another article reporting Wilson's disbarment and conviction; upon learning of the disbarment and conviction for the first time, Kwan terminated Wilson on August 16.[10] Therefore, even if Wilson had shown a genuine dispute as to whether Kwan acted with a retaliatory animus, he admits the but-for cause was his history reported in the newspaper articles—not his speech.

Based on the foregoing, the undisputed facts show the but-for cause of Wilson's termination was the District learning of his disbarment and conviction—not his political statements. *See Nieves*, 139 S. Ct. at 1722 (retaliation claim fails when adverse action would have been taken absent retaliatory motive). Thus, Defendants have shown there is no genuine dispute as to any material fact and they are entitled to judgment on Wilson's First Amendment claim.

B.   Age Discrimination

Defendants move for summary judgment on Wilson's age discrimination claims in Counts Five and Six, which the Court allowed to proceed after ruling on Defendants' Motion to Dismiss. (Doc. 66; Doc. 29 at 10.) Wilson has not moved for summary judgment on these claims. (Doc. 65.)

In Count Five, Wilson alleges he "was discriminated against on the basis of his . . . age when Defendants promoted [Alice]" to Lead Instructor "without advising Wilson of,

---

[10]Wilson also argues Defendants' EEO Report was "per se retaliatory" because if it had not been prepared with the intent to damage and retaliate against him, "it would have simply reported [] its findings and would not have included Defendants' Exhibits 4A, C, and D, which are nothing but tabloid garbage and nonsense and their only purpose is to damage and embarrass [him]." He further asserts those Exhibits—that is, the newspaper articles—are "retaliation per se because they falsely accuse [Wilson] of being a cold blooded murderer." (*Id.* at 7.) In the August 2020 Order, the Court explained the existence of the EEO investigation and resultant EEO Report do not show retaliatory intent and the Court need not address this argument again.

or offering to, Wilson that job opening." (Doc. 21 at 18.)  He asserts he was not offered the position because of his age and Alice was given the position "because she was . . . much younger than Wilson." (*Id.* at 19.)  In Count Six, Wilson realleges these allegations as violations of the ADEA. (*Id.*)

First, Defendants argue they are entitled to judgment because Wilson's age discrimination claims are time-barred, as he filed his EEOC charge more than 300 days after Alice's promotion. (Doc. 67 at 9.)  As noted above, Wilson's EEOC Charge is dated May 21, 2019 and in the section asking for the "[d]ate of most recent job action" he thought was discriminatory, he wrote: "08/22/2018."  Wilson wrote: "I have been an instructor with MCCCD since 1995.  Terminated on 08-22-2018." (Doc. 67-13, Exh. 5.)

Wilson argues his age discrimination claim is not barred by any failure to timely file an administrative charge because Alice's promotion to Lead Paralegal Instructor in 2014 "was just one example of the disparate job treatment Plaintiff suffered after her promotion," as he "received fewer classes and students to teach, smaller classes, no more course development or revision assignments, nor special projects." (Doc. 80 at 9–10.)  According to Wilson, his "damages are not time-barred due to their continuing and ongoing nature that lasted" up until his termination on August 16, 2018. (*Id.*)

The United States Supreme Court has rejected the notion a timely charge related to termination can save allegedly discriminatory actions that are time-barred.  In *National R.R. Passenger Corp. v. Morgan*, the Court explained: "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges alleging that act.  The charge, therefore, must be filed within the 180-or 300-day time period after the discrete discriminatory act occurred." 536 U.S. 101, 113 (2002).  In a similar employment discrimination case involving a college professor who alleged he was discriminated against when he was denied tenure, the Supreme Court held the limitations period commenced when the allegedly discriminatory acts occurred—not "upon the time at which the consequences of the acts became most painful." *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) (quoting *Abramson v. Univ. of Hawaii*, 594 F.2d 202, 209 (1979)).  In that

case, plaintiff was denied tenure, terminated about one year later, and did not file his EEOC charge until after he was terminated.  *Id.* at 257.  There, plaintiff argued discrimination motivated the College to not only deny him tenure, but also to terminate his employment. *Id.*  In effect, plaintiff claimed a "continuing violation" of the pertinent civil rights laws and was arguing the continuing violation meant that the limitations period did not commence until he was terminated.  *Id.*  The Supreme Court explained such an argument could not "be squared with the allegations of the complaint," because "[i]f [plaintiff] intended to complain of a discriminatory discharge, he should have identified the alleged discriminatory acts that continued until, or occurred at the time of, the actual termination of his employment.  But the complaint alleges no such facts."  *Id.*  The Court finds both *Morgan* and *Ricks* instructive here.

Although Wilson may believe he suffered "disparate" treatment on the basis of age after Alice was promoted over Wilson, until his termination in 2018, neither Wilson's EEOC Charge nor his administrative internal complaint names any allegedly discriminatory action other than him being passed over for the position that was given to Alice and being terminated.  Thus, the only acts the Court can look to in determining the start of the limitations period are the promotion of Alice and Wilson's termination.  The parties do not dispute Alice was promoted to Lead Paralegal Instructor in 2014.  (Doc. 80 at 10; Doc. 67 ¶ 7, Exh. 1.)  There is also no dispute Wilson's EEOC Charge was not filed until 2019.  (DSOF ¶ 73, Exh. 5.)  Therefore, Wilson's claim that he was discriminated against when he was passed over for the promotion is time-barred.  *See* 29 U.S.C. § 626(d). Accordingly, the Court grants summary judgment in favor of Defendants on Counts Five and Six with respect to the promotion.

As to his termination, Wilson does not argue in Counts Five or Six that his termination was discriminatory.  (Doc. 21 at 16–19.)  However, assuming for the sake of argument he had so argued, the Court would find, based on the undisputed material facts, Defendants are entitled to judgment on such a theory, as well. Defendants argue "age was not a factor in the decision to give [Alice] the Lead Paralegal Instructor Role," so age was not a but-for cause of Wilson not being hired for the role.  (Doc. 67 at 10.)  Specifically,

Defendants contend Alice was given that role because Kwan was impressed with her ideas to improve the paralegal department and she was better qualified for the role.  (*Id.*)  Unlike Wilson—who had never practiced law or worked as a paralegal in Arizona and who had not practiced law anywhere for twenty years, Alice was a licensed attorney in Arizona with recent work experience as an attorney, and she ran a legal placement consulting business, which "aligned with the department's goals to prepare their students for the workforce." (*Id.*)   Defendants also assert Wilson's "hostility toward the Paralegal Advisory Committee's recommendation to increase the legal writing and research curriculum demonstrates that he was not the right person to take a leadership role in moving the department forward."  (*Id.*)  Wilson admits he disagreed with the curriculum changes and, according to Kwan, Wilson's unwillingness to adapt to those changes was ultimately why she decided not to use Wilson in further course development.  (*Id.*)  Defendants also assert Wilson's age discrimination claim fails because he was terminated because of his disbarment and conviction.  The Court agrees.

Under the ADEA, it is "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  "When a plaintiff alleges disparate treatment, liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision.  That is, the plaintiff's age must have actually played a role in [the employer's decision making] process and had a determinative influence on the outcome." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (internal citations omitted).  To sustain a claim under the ADEA, a plaintiff must first establish a prima facie case of discrimination by showing he:  (1) was at least 40 years old; (2) was performing the job satisfactorily; (3) suffered an adverse action; and (4) was replaced by a substantially younger employee.  *See id.*  Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to "produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.  This burden is one of production, not persuasion; it can involve no credibility assessment."  *Id.* at 142 (internal quotations

and citations omitted) (alteration in original).

Here, it is undisputed Wilson satisfied the first and third elements, as he was in his seventies (age) and was terminated (adverse action).  The parties, however, dispute whether Wilson was performing his job satisfactorily, as Defendants argue Wilson was hostile towards and unwilling to adapt to changes in the paralegal department, which resulted in him being given fewer assignments to develop courses.  (Doc. 67 ¶¶ 23–30.)  And, since Wilson does not allege he was replaced by a younger employee after he was terminated, he has not established that element.  Because Wilson has not established a prima facie case, Defendants need not produce evidence showing Wilson was terminated for a nondiscriminatory reason.  Nonetheless, Defendants have produced ample evidence to show Wilson was terminated because of his disbarment and conviction, which are legitimate, non-discriminatory reasons, and Wilson has offered no evidence showing these were not the true reasons for his termination.  (Doc. 67-2; 67-4, 67-5.)  *See Reeves*, 530 U.S. at 142–43.  Therefore, based on the undisputed material facts, Defendants have shown they are entitled to judgment.

## V.     Conclusion

For the foregoing reasons, the Court finds Defendants have shown there is no genuine dispute as to any material fact and they are entitled to judgment as a matter of law on Wilson's First Amendment and age discrimination claims.  *See* Fed. R. Civ. P. 56(a).

**IT IS ORDERED:**

(1)     Defendants' Motion for Summary Judgment (Doc. 66) is **granted**, and this action is terminated with prejudice.

(2)     Wilson's Motion for Partial Summary Judgment (Doc. 65) is **denied**.

(3)     The Clerk of Court shall docket accordingly, enter judgment in favor of Defendants,  and close this action.

Dated this 31st day of March, 2022.

Honorable Scott H. Rash
United States District Judge